IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| WILLIE DELORIS LANIER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 11-00356-N |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

ORDER

Plaintiff Willie Deloris Lanier filed this action seeking judicial review of a final

decision of the Commissioner of Social Security ("Commissioner") that she was not

entitled to disability insurance benefits ("DIB") under Titles II of the Social Security

Act (the Act), 42 U.S.C. §§ 401-433.  Pursuant to the consent of the parties (doc. 15), this

action has been referred to the undersigned Magistrate Judge to conduct all proceedings

and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed. R.Civ.P.

73.  *See* Doc. 17.  Further, plaintiff's unopposed motion to waive oral arguments (doc.

14) was granted on July 27, 2012 (doc. 16).  Upon consideration of the administrative

record (doc. 8) and the parties' respective briefs (docs. 9 and 12), the undersigned

concludes that the decision of the Commissioner is due to be **AFFIRMED**.

I. Procedural History.

1

Plaintiff Willie Deloris Lanier filed an application for disability insurance benefits on March 13, 2007, claiming an onset of disability as of December 1, 1999 (Tr. 94-97). Lanier alleged that her disability was due to degenerative osteoarthritis, heart problems, hypertension, eye problems, and curvature of the spine. (Tr. 116, 146). Lanier was sixty-two old at the time she filed her application (Tr. 94). The application was denied on June 11, 2007 (Tr. 67-72) and Lanier requested a hearing (Tr. 73) before an Administrative Law Judge ("ALJ")[1]. The first of two administrative hearings was held on April 23, 2009 (Tr. 53-61). This hearing was continued to permit Lanier to retain an attorney. (Tr. 60). A second hearing was held on June 17, 2009, at which Lanier was represented by counsel. (Tr. 43-52). Following this second hearing, the ALJ issued an unfavorable decision on September 29, 2009 (Tr. 14-22). The ALJ found that Lanier was not disabled because she did not have a "severe" impairment during the relevant period, that is, between December 1, 1999, her alleged onset date, and December 31, 2003, the date she was last insured for DIB (Tr. 14-22).[2] Lanier requested a review by the Appeals Council (Tr. 12) which was subsequently denied on May 9, 2009 (Tr. 1-6), thereby making the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. §

---

[1]Lanier's applications were processed pursuant to 20 C.F.R. §§ 404.906(b)(4), 416.1406(b)(4), whereby after the initial determination, the reconsideration step in the administrative review process was eliminated, and the claimant could immediately request an administrative hearing. All references to the Code of Federal Regulations (C.F.R.) are to the 2011 edition.

[2] To be eligible for DIB, a claimant must be simultaneously disabled and "insured for disability insurance benefits." 42 U.S.C. § 423(a)(1)(A), (c)(1); *see also* 20 C.F.R. §§ 404.130, 404.315(a).

404.981 (2009).  Lanier has exhausted all her administrative remedies and now appeals from that final decision.

 II.  <u>Issues on Appeal</u>.

  1.  Whether the ALJ erred by failing to find that Lanier had a medically determinable severe impairment as of the date she was last insured for DIB benefits.

  2.  Whether the ALJ erred by failing to allow Lanier to give testimony at her hearing.

 III.  <u>Standard of Review</u>.

  A. <u>Scope of Judicial Review</u>.

In reviewing claims brought under the Social Security Act, this Court's role is a limited one.  Specifically, the Court's review is limited to determining: 1) whether the decision is supported by substantial evidence, and 2) whether the correct legal standards were applied. *See*, 42 U.S.C. §  405(g); <u>Jones v. Apfel</u>, 190 F.3d 1224, 1228 (11th Cir. 1999); <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990).  Thus, a court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  <u>Miles v. Chater</u>, 84 F.3d 1397, 1400 (11th Cir. 1996);  <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1986).  Rather, the Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1440 (11th Cir. 1997); <u>Chater</u>, 84 F.3d at 1400;  <u>Brown v. Sullivan</u>, 921 F.2d 1233, 1235 (11th Cir. 1991).   *See also*, <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990)("Even if the evidence preponderates against the Secretary's factual findings, we must affirm if the decision reached is supported by substantial evidence."); <u>Bloodsworth</u>

v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (finding that substantial evidence is defined as "more than a scintilla but less than a preponderance," and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion[ ]"). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. Lynch v. Astrue, 358 Fed.Appx. 83, 86 (11th Cir. 2009); Martino v. Barnhart, 2002 WL 32881075, * 1 (11th Cir. 2002); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision. Barron v. Sullivan, 924 F.2d 227, 230 (11th Cir. 1991).

B.    Statutory and Regulatory Framework.

The Social Security Act's general disability insurance benefits program ("DIB") provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. *See* 42 U.S.C. § 423(a). The Social Security Act's Supplemental Security Income ("SSI") is a separate and distinct program. SSI is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line. Eligibility for SSI is based upon proof of indigence and disability. *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C). However, despite the fact they are separate programs, the law and regulations governing a claim for DIB and a claim for SSI are identical; therefore, claims for DIB and SSI are treated identically for the purpose of

4

determining whether a claimant is disabled.  Patterson v. Bowen, 799 F.2d 1455, 1456 n. 1 (11th Cir. 1986). Applicants under DIB and SSI must provide "disability" within the meaning of the Social Security Act which defines disability in virtually identical language for both programs. *See* 42 U.S.C. §§  423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§  404.1505(a), 416.905(a). A person is entitled to disability benefits when the person is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner of Social Security employs a five-step, sequential evaluation process to determine whether a claimant is entitled to benefits. *See* 20 C.F.R. §§ 404.1520, 416.920 (2010).  The Eleventh Circuit has described the evaluation to include the following sequence of determinations:

(1) Is the person presently unemployed?

(2) Is the person's impairment(s) severe?

(3) Does the person's impairment(s) meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?[3]

---

[3] This subpart is also referred to as "the Listing of Impairments" or "the Listings."

(4) Is the person unable to perform his or her former occupation?

(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986).  *See also* Bell v. Astrue, 2012 WL 2031976, *2 (N.D. Ala. May 31, 2012); Huntley v. Astrue, 2012 WL 135591, *1 (M.D. Ala. Jan. 17, 2012).

The burden of proof rests on a claimant through Step 4. *See* Phillips v. Barnhart, 357 F.3d 1232, 1237–39 (11th Cir. 2004). Claimants establish a *prima facie* case of qualifying disability once they meet the burden of proof from Step 1 through Step 4. At Step 5, the burden shifts to the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform. *Id*.

To perform the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity (RFC). *Id*. at 1238–39. RFC is what the claimant is still able to do despite his impairments and is based on all relevant medical and other evidence.  *Id.*  It also can contain both exertional and nonexertional limitations. *Id*. at 1242–43. At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the claimant can perform. *Id.* at 1239. To do this, the ALJ can either use the Medical Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, app. 2 ("grids"),or hear testimony from a vocational expert (VE). Id. at 1239–40.

IV.  <u>Findings of Fact and Conclusions of Law</u>.

A.  <u>Statement of Facts</u>.

1.  <u>Lanier's Vocational Background</u>.

Lanier acknowledges that she was 64 years old at the time of her administrative hearing and was 58 years old at the time of she was last insured for DIB benefits.  (Doc.9 at 3).  Lanier has a college education and was an elementary school teacher from 1981-1994 and the school's bookkeeper/secretary until she stopped working on May 30, 1998. (*Id.*; Tr. 116, 131).

2.  <u>Medical Evidence Dated *Before* December 1, 1999, the Alleged Onset Date</u>.

The medical evidence dated prior to Lanier's alleged onset date showed a history of treatment for vision problems (Tr. 252-54, 310-11), shortness of breath (Tr. 241), chest pain (Tr. 334-36), hypertension (Tr. 181, 183), neck pain (Tr. 173), and degenerative joint disease of the left knee (Tr. 182-83, 191, 355). In February 1994, Kenneth Francez, M.D., diagnosed Lanier with atypical chest pain, dyspnea on exertion, hypertension, normal resting electrocardiogram, a benign physical examination, and symptoms of gastroesophageal reflux disease (GERD) versus esophageal spasm (Tr. 241).  Lanier underwent a chest x-ray in June 1995, which showed "borderline" cardiomegaly, aortic ectasia and uncoiling, clear lungs, and degenerative changes of the thoracic spine (Tr. 173).  In October 1996, she underwent a cervical spine x-ray that showed left sided neural foramen narrowing at C3-4 (Tr. 172).

On January 17, 1997, Lanier was admitted to East Montgomery Medical Center with "right upper quadrant pain, radiating to the right scapula" and a blood pressure of

176/106.  (Tr. 330).  Dr. Mark Anderson noted that she had "missed some days" prior to

admission of taking her prescribed medication; "her chemistries were normal and there

was no change in her EKG after eight hours [with] [r]hythm strips [being] all normal";

and "patient's blood pressure came under control with reinstitution of her medications."

(*Id*.).  Lanier's discharge diagnosis  was "Hypertensive cardiovascular disease; right

upper quadrant pain, etiology undetermined."  (*Id*.).  During this hospitalization, Lanier

was also seen by Dr. Phil Heidepriem who noted her "history of  hypertension" and her

complaint of chest pain and prescribed medications (Tr. 334-36).  Prior to her discharge,

Lanier had an upper GI series x-ray which revealed "[a] small sized sliding type hiatal

hernia [but] no spontaneous gastroesophageal reflex" and her "[s]tomach, duodenal bulb

and visualized portion of the small bowel were normal."  (Tr. 180).  Lanier was

discharged on January 20, 1997. (Tr. 330).

Medical records of Lanier's office visits to Adams Family Practice dated January

29, 1996 to May 27, 1998, (Tr. 181-193) were admitted into evidence.   Lanier's first

visit to Dr. Adams on January 29, 1996, was reported to be for a medical evaluation of

her high blood pressure and "stiffness" of her right hand and left side of her neck. (Tr.

181).  Lanier's next visit was not until January 21, 1997, for a follow-up from her

hospitalization reported above. (Tr. 182).  On March 4 and 25, 1997, Lanier was seen by

Dr. Adams  for abdominal, neck and knee pain.  (Tr. 182)[4].  An abdominal CT scan done

---

[4] On March 4, 1997, the office notes indicate a complaint of "dizziness" but with no
further discussion on that date, the follow-up visit on March 25, 1997.  (Tr. 182).

on March 10, 1997 at Dr. Kynard L. Adams request showed that Lanier had splenic granulomas and a three millimeter cyst in the posterior segment of the right lobe of the liver.  (Tr. 193).  Lanier was next seen by Dr. Adama on August 26, 1997 for a follow-up check of her blood pressure which was then recorded as 159/96 and a complaint of headaches. (Tr. 183).  Lanier's next visit to Dr. Adams on October 14, 1997, resulted in the notation of her blood pressure as 140/90 as well as complaints of "soreness back of neck [and] knee painful."  (Tr. 183).   Lanier's next office visit was April 13, 1998, when Dr. Adams noted a blood pressure of 150/90 and complaint of headches with dizziness, shortness of breath , fatique and a painful left knee.  (Tr. 184).  An MRI was done of Lanier's left knee on May 21, 1998, which resulted in a diagnosis of "Small joint effusion."  (Tr. 191).   A note sent to Lanier by Dr. Adams' Office reported the MRI results as indicating "some arthritic changes with fluid" for which a prescription for medication was given.  (Tr. 355).

   3.  Medical Evidence Dated *After* December 1, 1999, the Alleged Onset Date, but
       *Before* December 31, 2003, the Date Claimant Was Last Insured for DIB.

On January 27, 2000, Lanier underwent a cardiolite perfusion study which showed anterior attenuation probably most consistent with soft tissue attenuation and no consistent evidence to support significant ischemia or infarct at that time (Tr. 247). On April 8, 2000, Plaintiff underwent an eye examination which showed she had 20/25 visual acuity bilaterally. Glasses were prescribed (Tr. 250, 308).

On May 10, 2001,  Lanier underwent an echocardiogram study which showed she had "normal" left ventricle size without hypertrophy and "grossly normal" systolic

function with an ejection fraction of 55 to 60 percent.  It showed she had "normal" left atrium and right heart chambers, no obvious pericardial effusion or mitral valve prolapse, only "mild" fibrocalcific aortic valve disease, "mild-to-moderate" mitral regurgitation, and "mild" tricuspid regurgitation (Tr. 246).[5]

On July 23, 2003, Lanier underwent a stress echocardiogram study which was normal and showed no evidence of exercise induced wall motion abnormalities (Tr. 244). Dr. Charles W. Parrott also concluded from this test that there was no "evidence of mitral valve prolapsed on this study."  (Tr. 244).  On the same day, Lanier also underwent a treadmill exercise test which was declared by Dr.  Parrott to result in a "[c]linically and electrocardiographically negative stress test with a rare PVC [premature ventricular contraction]  noted in recovery."  (Tr. 245).[6] A resting electrocardiogram study done in conjunction with this stress test showed normal sinus rhythm rate of 80 with a non-specific interventricular conduction delay.  (Tr. 245).  Dr. Parrott did comment that,

---

[5] Lanier's contends that office notes from Cardiology Associates indicate that from January 1, 2001, she "has been diagnosed with hypertension, 55-60%, mitral valve prolapsed, and high cholesterol."  (Doc. 9 at 4, *citing* Tr. 235. It is, however, unclear what this document really represents.  Although it bears a date of "01/01/01" at the top of the document, it bears a date of "OCT 31 2006" at the end, following a signature designation of "8/23/06."  (Tr. 235). In addition, in the body of the document, it states only "CARDIAC DX: HTN, EF 55-60%, MVP, HIGH CHOLESTEROL" but later makes reference to "ECHO/VASCULAR STUDY: 12/98. ECHO 5/10/01, 7/23/03" as well as "HOLTER/LOOP: HOLTER 7/3/03."  (Tr. 235). According to Dr. M. Wail Hashimi's examination on May 10, 2001, "EF 55-60%" refers to the "ejection fraction" of the left ventricle. (Tr. 246).  Dr. Hashimi also found on May 10, 2001 that the "Echo criteria for mitral valve prolapsed *was not seen*."  (Tr. 246, emphasis added).

[6] For this test, Lanier exercised for six minutes, 41 seconds on Bruce protocol achieving a peak heart rate of 149, which was equal to roughly eight METs of workload and 90 percent of age predicted maximums. (Tr. 245).

during exercise, there was a lot of artifact but that he did not "see any obvious arrhythmia or ST segment changes." (Tr. 245).

        4.   Medical Evidence Dated *After* December 31, 2003, the Date Claimant Was Last Insured for DIB.

Medical evidence dated after Lanier's date last insured was notable for treatment of cardiovascular symptoms (Tr. 207, 236, 238, 242, 248, 295-96, 373-76, 426-27, 382, 425, 429-31, 432), hip and knee pain (Tr. 356-58), and vision problems (Tr. 249). On August 27, 2005, Lanier was admitted to South Bay Medical Center and seen by Dr. David Liao with complaints of confusion. (Tr. 197). Dr. Liao diagnosed "acute emotional stress response leading to amnesia and confusion," which he concluded was "likely secondary to emotional response to brother's death." (Tr. 198). Dr. Liao also noted that her blood pressure was 195/150. (Tr. 197). He recommended psychiatric care and prescribed hydralazine and hydrochlorothiazide (anti-hypertensive medications). (Tr. 198). That same day, Lanier underwent a carotid artery ultrasound, which was normal (Tr. 198, 205); a chest x-ray that showed no acute cardiopulmonary process (Tr. 198, 207); and a brain CT scan that showed calcification of the pineal gland, choroid plexus, and falx cerebri, but no mass lesion, abnormal increased or decreased density, or infarct, and was therefore reported by Dr. Liao as "negative." (Tr. 198, 208). Lanier was discharged on August 28, 2005. (Tr. 200).

On July 28, 2006, Lanier underwent a treadmill cardiolite stress test that showed good exercise tolerance, achieving 10 METs, "normal" ventricular systolic functioning, anterior soft tissue attenuation artifact, and no ischemia (Tr. 242). On August 16, 2006,

Lanier  underwent an eye examination and was diagnosed with nuclear sclerotic cataracts, benign skin lesions on her eyelids, bilateral pingacula, and arcus of the corneas (Tr. 249).  The resulting plan involved new glasses and to re-evaluate the cataracts in about 8 months.  (Tr. 249).

On October 31, 2006, Lanier underwent an echocardiogram study that showed "normal" left ventricular chamber dimensions, an ejection fraction of 60 percent, "slightly" redundant mitral leaflet, no mitral valve prolapse, and "trivial" mitral regurgitation.  (Tr. 248).  The test also revealed a "normal" aortic root size without stenosis or regurgitation, a "normal" right atrium and ventricle, "minimal" tricuspid regurgitation, no pulmonary hypertension, and "normal" right ventricular function and pericardial space.  (Tr. 248).

On April 26, 2007, a physician[7] completed a "Medical Report" of visual examination wherein he reported that Lanier had 20/20 visual acuity bilaterally with best correction. He also reported that Lanier had "no significant pathology" of the eyes, a "good" prognosis,  "normal vision [with] glasses," and "no visual disability" (Tr. 305-06).

On October 12, 2007, Dr. Parrott wrote a letter in which he stated Lanier had mitral valve regurgitation, hypertension, and palpitation, and was "severely incapacitated

---

[7] Although the signature is illegible, it bears a legible designation of "MD" and is on a document identified as a report from the records of Premier Medical Eye Group - West.  (Tr. 306; Doc. 8-1 at 2)).

because of her cardiac arrhythmia." He also said that, "because of her incapacity, she ha[d] not been able to work since 1999" (Tr. 328).

On August 14, 2008, Lanier underwent an echocardiogram study that showed "normal" left ventricular systolic function with an ejection fraction of 55 percent (Tr. 382). She also underwent a pharmacological stress test on August 14, 2008, the results of which were indeterminate as to "maximal stress test." (Tr. 431). Dr. Parrott noted that Lanier was unable to exercise long enough to do a stress injection and that she had a right bundle branch block at rest and during exercise, but no obvious ischemia and only "occasional" PVCs.  (Tr. 431).  There were no ST segment changes noted and the cardiolite perfusion imaging was negative with "normal" left ventricular size and function and no evidence of any exercise induced ischemia (Tr. 431).

On January 27, 2009, Plaintiff complained to Dr. Sid Crosby, a physician at Family Medical of Jackson, P.C.,  about pain in her hips and knees. (Tr. 356).  According to Dr. Crosby, this pain was reported by Lanier to be "moderate" in severity, "intermittent" with "gradual onset" in timing, is "worse at night" and began "2 weeks" prior to this office visit. (Tr. 356).  Dr. Crosby found 3/5 hip and knee strength with all movements.  (Tr. 358).  Dr. Crosby diagnosed osteoarthritis and prescribed Motrin (Tr. 358).[8]

---

[8] Lanier contends that "[r]ecords from East Montgomery Medical Center dated October 3, 1996, show that [she] has left sided neural foramen narrowing at C3-4."  (Doc. 9 at 4, *citing* Tr. 329-349).  Lanier has incorrectly cited the record.  Lanier did present to the emergency room of  East Montgomery Medical Center on October 3, 1996 complaining of "NECK PAIN X3 YRS (Continued)

5.    Administrative Hearing and Correspondence.

Lanier appeared at the first scheduled administrative hearing on April 23, 2009, but was not represented by counsel.  (Tr. 55).  After the ALJ advised Lanier of her right to representation, she requested a continuance so she could obtain an attorney (Tr. 53-61).

A supplemental hearing was held on June 17, 2009 (Tr. 43-52), at which time Lanier appeared with counsel.   Lanier's attorney and the ALJ discussed whether the medical evidence of record showed she had a disabling impairment on or before December 31, 2003, the date she was last insured for DIB.  The ALJ did not place claimant under oath and solicited no testimony from her during the hearing.  Lanier's attorney did not ask the ALJ to take Lanier's testimony.   The ALJ gave Lanier's attorney two weeks  to submit a brief explaining how the evidence showed that Lanier was disabled on or before her last insured date (Tr. 43-52).

---

WORSE THIS DATE."  (Tr. 168). The following results of the cervical spine series of x-rays revealed:

> Multiple views show ***normal alignment*** of the vertebral bodies.  No fracture or subluxation is seen.  There is ***some narrowing*** of the left neural foramen at C3-4 caused by prominent bony osteophyte from the C-4 superior articular facet.  No other neural foraminal narrowing is seen.  Disc spaces are well maintained.

(Tr. 172, emphasis added).  The only treatment ordered as a result of this emergency room visit was "Bedrest for 48 hours [and] Follow up with Dr. Adams."  (Tr. 171).  Lanier then relies solely on the report of a chest x-ray taken on June 29, 1995, which contains a statement that Lanier's "bones are demineralized and there are degenerative changes in the thoracic spine."  (Tr. 173). Lanier points to no other evidence in the medical records that relate to her cervical or thoracic spine.

On June 30, 2009, Lanier's attorney submitted a brief to the ALJ in which she requested a fully favorable decision based on Dr. Parrott's opinion[9] and because the "combination of [Plaintiff's] impairments reduced her maximum residual functional capacity to below the sedentary level."  (Tr, 165).  Lanier's attorney did not request that the ALJ elicit any testimony from Lanier  (Tr. 165-66), nor did she submit an affidavit from Lanier.

     6.  <u>The ALJ's Decision</u>.

The ALJ followed the five-step sequential evaluation process for evaluating disability claims. See 20 C.F.R. § 404.1520(a)(4).  As an initial matter, the ALJ found that Lanier last met the insured status requirements of the Social Security Act on December 31, 2003.  (Tr. 19). He found that, through Lanier's date last insured, she had the following medically determinable impairments:

- Hypertension;

- Arrhythmia;

- Mild cardiomegaly;

- Cervical arthritis; and

- Arthritic changes in the left knee

---

[9] Lanier's attorney relies (Tr. 165) upon a letter written by Dr. Parrott on October 12, 2007 (Tr. 328) in which he contends that Lanier "suffers from mitral valve regurgitation, hypertension and palpitations, and [] is severely incapacitated because of her cardiac arrhythmias."   Dr. Parrott also opines that ,"[b]ecause of her incapacity, [lanier] has not been able to work since 1999." (Tr. 328).

(Tr. 19).  The ALJ determined that, through the date  Lanier's was last insured for DIB

benefits, she did not have an impairment or combination of impairments that significantly

limited her ability to perform basic work-related activities for 12 consecutive months and,

therefore, did not have a "severe" impairment or combination of impairments.  (Tr. 19-

21).  As a result, the ALJ found that Lanier was not disabled at any time from December

1, 1999, her alleged onset date, through December 31, 2003, the date she was last insured

for DIB.  (Tr. 21).

        B.    <u>Conclusions of Law</u>.

            1.    <u>The ALJ Properly Evaluated the Severity of Lanier's Impairments</u>.

Lanier argues that the ALJ erred because he did not find that she had a "severe"

impairment on or before her date last insured, December 31, 2003.  (Doc. 9 at 2-5). This

Court disagrees.

Social Security Ruling (SSR) 96-3p provides that, "[a]t step two of the sequential

evaluation process, an impairment or combination of impairments is considered 'severe'

if it significantly limits an individual's physical or mental abilities to do work activities."

An impairment that is "'not severe' must be a slight abnormality (or combination of

slight abnormalities) that has no more than a minimal effect on the ability to do basic

work activities." Social Security Ruling (SSR) 96-3p, 1996 WL 374181 (July 2, 1996).

A "severe" impairment must last or be expected to last for a continuous period of at least

12 months." *See* 20 C.F.R. § 404.1520(a)(4)(ii), (c) (requiring presence of a severe

medically determinable impairment(s) that meets the duration requirement in 20 C.F.R. §

404.1509).  It is the claimant's burden to show she has a "severe" impairment or

combination of impairments. *See* <u>Bowen v. Yuckert</u>, in which the Supreme Court

explained:

> The severity regulation does not change the settled allocation of burdens of proof in disability proceedings. It is true, as Yuckert notes, that the Secretary bears the burden of proof at step five, which determines whether the claimant is able to perform work available in the national economy. But the Secretary is required to bear this burden only if the sequential evaluation process proceeds to the fifth step. The claimant first must bear the burden at step one of showing that he is not working, at step two that he has a medically severe impairment or combination of impairments, and at step four that the impairment prevents him from performing his past work. If the process ends at step two, the burden of proof never shifts to the Secretary.

482 U.S. 137, 146 n.5 (1987).

The medical evidence does not reflect that Lanier had a "severe" impairment on or

prior to her date last insured.  Prior to December 1, 1999, Lanier's alleged onset date, a

chest x-ray in June 1995 showed she had only "borderline" cardiomegaly.  (Tr. 173).  In

January 1997, an abdominal CT scan showed that she had only "mild" cardiomegaly.

(Tr. 329-31, 340).  In March 1997, Lanier was diagnosed with only "mild" degenerative

joint disease of the knees (Tr. 182).  In May 1998, a left knee MRI study showed she had

only "some" arthritic changes with fluid (Tr. 191, 355). Notably, during this time frame,

Plaintiff continued to work full-time (Tr. 116). *See, e.g.,* 20 C.F.R. § 404.1571 ("Even if

the work you have done [during a period of

claimed disability] was not substantial gainful activity, it may show that you are able to

do more work than you actually did."); *see* <u>Cauthen v. Finch</u>, 426 F.2d 891, 892 (4th Cir.

1970) (affirming denial of benefits where the claimant worked for years with

longstanding problems which affected her ability to the same extent and "quit work of her

own volition rather than upon the advice of doctors."); Gorham-Coleman v. Astrue, 2010 WL 3724705 (D. S.C. July 16, 2010)(affirming denial of benefits because there was no evidence that claimant's polycythemia and hearing loss had worsened since 2003 and, "[i]f a claimant works for years with her impairments, her impairments are not disabling absent a worsening of her condition.").

The medical evidence during the relevant period, beginning December 1, 1999, Lanier's alleged onset date, through December 31, 2003, the date her insured status expired, likewise did not show that she had a "severe" impairment. Treatment records during the relevant period are sparse, suggesting that Lanier did not have a severe impairment on or prior to her date last insured. See, e.g., Watson v. Heckler, 738 F.2d 1169, 1173 (11th Cir. 1984) (in addition to objective medical evidence it is proper for ALJ to consider use of pain-killers, failure to seek treatment, daily activities, conflicting statements, and demeanor at the hearing). Of the medical evidence dated during the relevant period, in January 2000, a cardiolite perfusion study showed no evidence of significant ischemia or infarct (Tr. 247). Further, an echocardiogram study in May 2001 showed Lanier had "normal" left ventricular size without hypertrophy, "grossly normal" systolic function with an ejection fraction of 55 to 60 percent, "normal" left atrium and right heart chambers, no obvious pericardial effusion or mitral valve prolapse, only "mild" fibrocalcific aortic valve disease, only "mild-to-moderate" mitral regurgitation, and only "mild" tricuspid regurgitation (Tr. 246). In July 2003, Lanier underwent a stress echocardiogram study, which showed no evidence of exercise induced wall motion abnormalities (Tr. 244). She underwent an exercise treadmill test wherein she exercised

for six minutes 41 seconds on Bruce protocol achieving a peak heart rate of 149, which was equal to roughly eight METs of workload and 90 percent of age predicted maximums. Lanier also underwent a resting electrocardiogram which showed a normal sinus rhythm rate of 80.  Dr. Parrott said that, while he saw "at least one" PVC, he did not see any obvious arrhythmia or ST segment changes.  (Tr. 245).

In July 2006, a treadmill cardiolite test showed Lanier  had good exercise tolerance, achieving 10 METs, "normal" ventricular systolic functioning, and no ischemia.  (Tr. 242). The following October, an echocardiogram study showed Lanier had "normal" left ventricular chamber dimensions, an ejection fraction of 60 percent, only "slightly" redundant mitral leaflet, no mitral valve prolapse, and "trivial" mitral regurgitation.  It further showed she had "normal" right aortic root size without stenosis or regurgitation, "normal" right atrium and ventricle, only "minimal" tricuspid regurgitation, no pulmonary hypertension, and "normal" right ventricular function and pericardial space. (Tr. 248).  In August 2008, an echocardiogram study showed Lanier had "normal" left ventricular systolic functioning with an ejection fraction of 55 percent (Tr. 382)

and cardiolite perfusion imaging was negative with "normal" left ventricular size and function and no evidence of any exercise induced ischemia (Tr. 430-31).

Lanier argues that, in finding that she did not have a "severe" impairment on or before December 31, 2003, the date she was last insured for DIB, the ALJ erroneously rejected the opinion of Dr. Parrott (Pl.'s Br. at 2). The regulations provide that, if a treating source opinion is well-supported by medically acceptable clinical and laboratory

19

diagnostic techniques and is not inconsistent with the other substantial evidence in the claimant's case record, the ALJ will give it controlling weight.  It is also well established in the Eleventh Circuit that the opinion of a treating physician must be given substantial or considerable weight unless "good cause" is shown to the contrary. Phillips v. Barnhart, 357 F.3d 1232, 1240-41 (11th Cir. 2004),quoting Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). "'Good cause' exists when the (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Id. , citing Lewis, 125 F.3d at 1440.  See also Duthie v. Astrue, 2012 WL 2505920 (S.D. Ala. June 28, 2012)("The ALJ cited language from within the forms as well as portions of the treatment records of Dr. Yoder; this evidence is facially sufficient under binding precedent to justify giving those opinions less than controlling weight.").

Dr. Parrott's opinion that Lanier was "incapacitated" and "not able to work" were not medical opinions, but, rather, administrative findings on issues reserved to the Commissioner, particularly as Dr. Parrott had never imposed any limitations or restrictions upon Lanier during the course of his treatment.  See 20 C.F.R. § 404.1527(e)(1)-(3) (treating source opinions on issues that are reserved to the Commissioner are never entitled to special significance);  Caulder v. Bowen, 791 F.2d 872, 878 (11th Cir. 1986) (physician's statement that a claimant is disabled is not dispositive on the issue of disability and must be considered in the Commissioner's examination of the totality of the evidence). Dr. Parrott's opinion was also dated October 12, 2007 (Tr. 328), almost four years after Plaintiff's insured status expired. SSR 83-10,

1983 WL 31251, at *8 ("Under Title II, a period of disability cannot begin after a worker's disability insured status has expired.").

In the final analysis, Dr. Parrott's opinion is inconsistent with the other medical evidence of record dated during the relevant period, specifically from December 1, 1999 through December 31, 2003.  (Tr. 21).  As discussed above, the evidence from this period was not only sparse but did not show that Lanier  had a "severe," or much less a disabling impairment or combination of impairments.  In January 2000, a cardiolite perfusion study showed Lanier  had no significant ischemia or infarct. (Tr. 247).  In May 2001, an echocardiogram study showed Lanier had "normal" left ventricular size without hypertrophy and "grossly normal" systolic function with an ejection fraction of 55 to 60 percent. It showed she had a "normal" left atrium and right heart chambers, no obvious pericardial effusion or mitral valve prolapse, only "mild" fibrocalcific aortic valve disease, only "mild-to-moderate" mitral regurgitation, and only "mild" tricuspid regurgitation.  (Tr. 246).  In July 2003, Lanier underwent a stress echocardiogram study which was normal and showed no evidence of exercise induced wall motion abnormalities.  (Tr. 244). She also underwent a treadmill test where she achieved a peak heart rate of 149, roughly equal to eight METs of workload and 90 percent of age predicted maximums. A resting electrocardiogram study showed normal sinus rhythm rate of 80 with non-specific interventricular conduction delay and Dr. Parrott himself did not see any obvious arrhythmia or  ST segment changes.  (Tr. 245).  *See* Phillips, 357 F.3d at 1241 (Good cause exists to discount a treating physician's opinion when it is not

bolstered by the evidence, evidence supported a contrary finding, or treating physician's

opinion was conclusory or inconsistent with the doctor's own medical records).

> 2.      The ALJ Did Not Err by Failing To Take Testimony From Lanier.

Lanier argues that the ALJ erred by not allowing her to give testimony at her

administrative hearing on June 17, 2009 (Doc. 9 at 2, 5-6).  A review of the relevant

transcript establishes that neither Lanier nor her attorney ever asked the ALJ to take

Lanier's testimony or to assert that such testimony was necessary.  (Tr. 43-52).  The ALJ

also gave Lanier another opportunity to explain how the evidence supported her claim of

disability prior to December 31, 2003, by permitting Lanier to submit a brief and further

evidence.  (Tr. 51-52). Lanier did submit a brief and further evidence but did not therein,

or in conjunction therewith, request that the ALJ let her testify, nor did claimant submit

an affidavit. (Tr. 165-66).  *See* Campbell v. Astrue, 2012 WL 2848898, *7 (N.D. Fla.

June 11, 2012)(ALJ's actions not construed as "failing to permit plaintiff to testify,

because "Plaintiff was represented by counsel, his counsel did not indicate to the ALJ

that Plaintiff wished to testify, and the ALJ advised counsel she could submit materials to

him following the limited hearing [and] there is no reason why Plaintiff could not have

submitted an affidavit or similar statement after the hearing.").   It was Lanier's burden to

prove that she was disabled, and, as the ALJ properly concluded, she has failed to do so.

*See* Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003) (The claimant has the

burden of proving he is disabled and is therefore responsible for producing evidence in

support of his claim).

CONCLUSION.

For the reasons stated above, it is hereby **RECOMMENDED** that the decision of the Commissioner of Social Security denying plaintiff's benefits be **AFFIRMED**.

Done this   7th   day of August, 2012.


/s/ Katherine P. Nelson
**KATHERINE P. NELSON**
**UNITED STATES MAGISTRATE JUDGE**